UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| In re: Case No. A09-00565-DMD<br><br>THOMAS WILLIAM MORTENSEN,<br><br>Debtor. | Chapter 7<br><br>**Filed On**<br><br>5/26/11 |
| KENNETH BATTLEY,<br><br>Plaintiff,<br><br>v.<br><br>ERIC J. MORTENSEN, ROBIN MARIE MULLINS, MARY MARGARET MORTENSEN-BELOUD, in their capacities as trustees of the Mortensen Seldovia Trust, and THOMAS W. MORTENSEN, in his individual capacity,<br><br>Defendants. | Adv. No. A09-90036-DMD |

**MEMORANDUM DECISION**

   Kenneth Battley, chapter 7 trustee, has brought this adversary proceeding to set aside a transfer of real property as a fraudulent conveyance. It is a core proceeding under 28 U.S.C. § 157(b)(2)(H). Jurisdiction arises under 28 U.S.C. § 1334(b) and the district court's order of reference. Trial was held on March 21 - 23, 2012. I find for the plaintiff.

Factual Background

Thomas Mortensen, the debtor and one of the defendants herein, is a self-employed project manager. He has a master's degree in geology but has not worked in that field for 20 years. He manages the environmental aspects of construction projects. Mortensen has contracted with major oil companies for work in the past.

In 1994, Mortensen and his former wife purchased 1.25 acres of remote, unimproved real property located near Seldovia, Alaska.[1] They paid $50,000.00 cash for the purchase. The parties divorced in 1998. Mortensen received his former wife's interest in the property. Subsequently, improvements were made to the property. A small shed was placed on the parcel in 2000 and some other small structures were built on it from 2001 through 2004. There is power to the property along with a well and septic system. The debtor transferred the property to a self-settled trust on February 1, 2005. The transfer of this property is the focal point of the current dispute.

Mortensen's divorce was a contested proceeding. In 1998, when the court divided the parties' assets and liabilities, Mortensen argued that the Seldovia property had been purchased with an inheritance and was to remain his sole and separate property. The court rejected his argument. It found that Mortensen wasn't credible on the issue,[2] and that

---

[1] Mortensen testified that he accesses the property by taking a boat from Homer to Seldovia, then driving about 7 miles down an old logging road out of Seldovia and, finally, switching to a narrower footpath or ATV trail to reach the parcel.

[2] Pl.'s Ex. 13 at 8, ¶ 36.

2

the property was joint marital property.[3]  Nonetheless, Mortensen received the Seldovia property. He also received $61,581.00 from his wife's SBS account, another $24,000.00 in cash from the refinance of the couple's home and other miscellaneous personal property.  In total, Mortensen received assets of $164,402.00 in the divorce.[4]

Mortensen was not liable for any debt arising out of the marital estate. His ex-wife received the family home.  She assumed an encumbrance against the home and was obligated to remove Mortensen's name from a $78,000 obligation encumbering the home.[5] There was no credit card debt described in the courts findings and conclusions and no credit card debt was to be assumed by either party to the divorce.[6]

In June of 2004, Mortensen filed a motion to impose child support against his ex-wife.[7]  Despite a joint custody arrangement, he asked for an increase in child support due to a decrease in his income.  After the superior court granted his uncontested request, Mortensen's former spouse filed a Rule 60(b) motion.  He filed an opposition to the motion on July 30, 2004. In his opposition, Mortensen stated:

> The property settlement and other expenses of the divorce drove me deeply into debt.  After

---

[3] *Id.* at 12, ¶ 66.

[4] *Id.* at 13, ¶ 17.

[5] *Id.* at 14, ¶ 84.A.

[6] Pl.'s Ex. 13.

[7] Exhibit 12.

3

> the divorce my debt continued to increase due to the ongoing legal expenses and the time required from profitable work in order to respond to two more years of repeated motions from the defendant. The defendant continued with motion practice for two years after the divorce ended. The defendant did not cease the motion practice until Judge Shortell told her in 2000 that he would consider awarding me attorney's fees if she persisted in filing frivolous motions. Saddled with debt and with increasing competition in my shrinking business market I have not recovered from the financial carnage of the divorce.[8]

Mortensen's income fluctuated substantially from year to year after the divorce. His 1999 income tax return was not placed into evidence. At a hearing held in state court on December 22, 2004, Mortensen revealed his annual income from 2000 through 2004. His net income in 2000 was $32,822.00.[9] He also cashed out an annuity for $102,023.18 that year. In 2001, Mortensen had net income of $16,985.00.[10] In 2002, his annual income dipped to $3,236.00.[11] 2003 yielded income of $13,185.00.[12] Mortensen's 2004 income was

---

[8] Pl.'s Ex. 9 at 15.

[9] Pl.'s Ex. 4 at 24:22.

[10] *Id.* at 24:20.

[11] *Id.* at 24:16.

[12] *Id.* at 21:25 - 22:6.

4

"about the same" as 2003.[13] Prior to the divorce, Mortensen had averaged $50,000.00 to $60,000.00 a year in net income.[14]

Mortensen didn't reveal his interest in establishing an asset protection trust at the hearing in December of 2004. Mortensen had heard about Alaska's asset protection trust scheme in casual conversation. He researched the topic and, using a template he had found, drafted a document called the "Mortensen Seldovia Trust (An Alaska Asset Preservation Trust)." Mortensen then had the trust document reviewed by an attorney. He said only minor changes were suggested by the attorney.

The express purpose of the trust was "to maximize the protection of the trust estate or estates from creditors' claims of the Grantor or any beneficiary and to minimize all wealth transfer taxes."[15] The trust beneficiaries were Mortensen and his descendants. Mortensen had three children at the time the trust was created.

Mortensen designated two individuals, his brother and a personal friend, to serve as trustees. His mother was named as a "trust protector," and had the power to remove and appoint successor trustees and designate a successor trust protector. She could not designate herself as a trustee, however. The trustees and Mortensen's mother are named defendants in this adversary proceeding.

---

[13] Pl.'s Ex. 4 at 24:25.

[14] The superior court found that Mortensen earned $54,000.00 in 1994, $57,000.00 in 1995, $46,500.00 in 1996, and $62,690.00 in 1997. His estimated income for 1998 was between $53,360.00 and $69,000.00. Exhibit 13, page 5, paragraph 13.

[15] Def.'s Ex. A at Mortenson 0006.

5

The trust was registered on February 1, 2005.[16] As required by AS 34.40.110(j), Mortensen also submitted an affidavit which stated that: 1) he was the owner of the property being placed into the trust, 2) he was financially solvent, 3) he had no intent to defraud creditors by creating the trust, 4) no court actions or administrative proceedings were pending or threatened against him, 5) he was not required to pay child support and was not in default on any child support obligation, 6) he was not contemplating filing for bankruptcy relief, and 7) the trust property was not derived from unlawful activities.[17]

On February 1, 2005, Mortensen quitclaimed the Seldovia property to the trust, as contemplated in the trust document.[18] Per the trust, this realty was "considered by the Grantor and the Grantor's children to be a special family place that should not be sold and should remain in the family."[19] To facilitate this purpose, the trustees of the trust were requested, but not directed, to maintain and improve the Seldovia property "in the trust for the benefit, use and enjoyment of the Grantor's descendants and beneficiaries."[20]

The Seldovia property was worth roughly $60,000.00 when it was transferred to the trust in 2005. Mortensen's mother sent him checks totaling $100,000.00 after the

---

[16] Def.'s Ex. B.

[17] Def.'s Ex. C.

[18] Def.'s Ex. D. The quitclaim deed was recorded in the Seldovia Recording District on February 3, 2005. *Id.*

[19] Def.'s Ex. A at Mortensen 0009.

[20] *Id.*

6

transfer. Mortensen claims this was part of the deal in his creation of the trust; his mother was paying him to transfer the property to the trust because she wanted to preserve it for her grandchildren. This desire is corroborated by notes his mother included with the two $50,000.00 checks she sent to him. The first check, No. 1013, was dated February 22, 2005, and referenced the Seldovia Trust, which had been registered just three weeks earlier.[21] A short, handwritten note from Mortensen's mother, bearing the same date stated:

> Enclosed is my check #1013 in the amount of fifty thousand dollars, as we have discussed, to pay you for the Seldovia property that you have put into the trust for my three special "Grands"!
>
> In the next few weeks there will be a second check mailed to you in the amount of fifty thousand dollars, making a total of $100,000.00.
>
> What a lot of fun memories have been made there![22]

Mortensen's mother wrote him a second check on April 8, 2005.[23] This check also referenced the Seldovia Trust. It was accompanied by a typewritten note which said, "Here we go with the second and final check for the Seldovia property in the amount of fifty thousand dollars, totaling in all $100,000.00, as we have been talking about."[24]

---

[21] Def.'s Ex. E at Mortensen 0079.

[22] *Id.* at Mortensen 0080.

[23] *Id.* at Mortensen 0087.

[24] *Id.* Mortensen 0088.

7

Mortensen says he used the money his mother sent him to pay some existing debts and also put about $80,000.00 of the funds into the trust's brokerage account as "seed money" to get the trust going and to pay trust-related expenses, such as income and property taxes. There was no promissory note for the money he lent to the trust. Mortensen said these funds were invested, some profits were made, and he was repaid "pretty much" all of the loan within about a year's time.

Mortensen says the Seldovia property is recreational property. It was used primarily by him and his three children, but other family members also used it. Before the trust was created, Mortensen had lived on the property the majority of the time, and he says he could have exempted it from creditors' claims as an Alaska homestead if he had retained it rather than placing it in the trust. In support of this contention, he has provided copies of his 2004 Alaska voter registration application,[25] his 2003 fishing certificate,[26] his 2004 Alaska PFD application (filed in 2005),[27] a January, 2005, jury summons,[28] and his Alaska driver's license,[29] which all indicate that he resided in Seldovia when the trust was created.

---

[25] Def.'s Ex. I.

[26] Def.'s Ex. J.

[27] Def.'s Ex. K.

[28] Def.'s Ex. L.

[29] Def.'s Ex. M.

Mortensen's financial condition has deteriorated since the establishment of the trust. His income has been sporadic.[30] He used the cash he received from his mother and his credit cards to make speculative investments in the stock market and to pay living expenses. His credit card debt ballooned after the trust was created. In 2005, total credit card debt ranged from $50,000.00 to $85,000.00.[31] When he filed his petition in August of 2009, Mortensen had over $250,000.00 in credit card debt. The $100,000.00 he received from his mother has been lost.

Mortensen claims that he was always able to make at least the minimum monthly payment on his credit card debts until he became ill in April of 2009. He needed immediate surgery and was hospitalized for almost two weeks. His illness required a long period of convalescence. Mortensen says he tried to return to work but was on pain medication which made him "fuzzy." He lost several work contracts while he was recovering. He first considered filing bankruptcy in early August, 2009.

Mortensen filed his chapter 7 petition on August 18, 2009. He owned no real property at the time of filing, but his Schedule B itemized personal property with a value of $26,421.00. He scheduled no secured or priority claims. General unsecured claims totaled $259,450.01, consisting of $8,140.84 in medical debt and $251,309.16 in credit card debt

---

[30] Mortensen had total income of $63,197.00 in 2005; $24,430,00 in 2006; $50,040.00 in 2007; $24,887 in 2008; and $6,142.00 in 2009.

[31] Mortensen's statements and other evidence regarding the amount of his credit card debt at the time of the creation of the trust have been inconsistent.

9

on 12 separate credit cards. His interest in the Seldovia Trust was not scheduled, but Mortensen disclosed the creation of the trust on his statement of financial affairs. His monthly income was listed as $4,221.00, consisting of $321.00 in child support and the balance as income from the operation of his business as a geologist and permits consultant. Mortensen indicates that he expected his income to decrease due to his ongoing health issues and the increasingly unfavorable market conditions for his profession. His itemized monthly expenses totaled $5,792.00, which exceeded his income by more than $1,500.00. Expenses included $1,350.00 for rent, $600.00 for "income and FICA tax obligations, not withheld," and $1,650.00 for expenses from the operation of his business.

Analysis

The trustee alleges that Mortensen failed to establish a valid asset protection trust under Alaska's governing statutes because Mortensen was insolvent when the trust was created on February 1, 2005. Under A.S. 34.40.110(j)(2), the settlor of an Alaskan asset protection trust must file an affidavit stating that "the transfer of the assets to the trust will not render the settlor insolvent."[32] "Insolvent" is not defined in Alaska's asset protection trust statute or in any cases arising thereafter. The trustee applies the Bankruptcy Code's definition of insolvency found in 11 U.S.C. § 101(32), which provides that the term "insolvent" means:

---

[32] AS 34.40.110(j)(2).

10

> (A) with reference to an entity other than a partnership and a municipality, financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair evaluation, exclusive of –
>
> (i) property transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors; and
>
> (ii) property that may be exempted from property of the estate under section 522 of this title;[33]

While there is no indication that Alaska would adopt a similar definition in the trust statute, other states have adopted a similar approach.[34] I conclude that insolvency is established for purposes of Alaska's asset protection trust law if the debtor's liabilities exceed its assets, excluding the value of fraudulent conveyances and exemptions. Here, the applicable exemptions will be determined under state rather than federal law, because this court is applying Alaska law to determine if the trust was correctly established. The federal exemption statutes have no role in making that determination.

The trustee contends that the $100,000.00 received from Mortensen's mother was a gift and cannot be considered as an asset in making a determination of solvency. I respectfully disagree. Mortensen and his mother had an oral agreement for the creation of a trust for the benefit of Ms. Mortensen-Belound's grandchildren. Mortensen was to place

---

[33] 11 U.S.C. § 101(32)(A).

[34] *See* 37 AM.JUR. 2D *Fraudulent Conveyances and Transfers* §§ 20, 21 (1964).

11

the Seldovia property in trust and in return, his mother promised to pay him $100,000.00. Mortensen performed his end of the bargain. Based on his mother's promise, he transferred the Seldovia property to an irrevocable trust on February 1, 2005.[35] His partial performance took the agreement outside the statute of frauds.[36] As noted in § 90(1) of the *Restatement (Second) of Contracts*:

> (1) A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.[37]

Ms. Mortensen-Belound's promise of payment should reasonably have been expected to induce action on the part of Mortensen and it did induce such action. The promise was binding on Ms. Mortensen-Belound and the proper remedy for a breach would have been payment of $100,000.00. Justice could have been avoided only by enforcement of the promise because Mortensen's creation of the trust was irrevocable. Justice would not require limitation of a remedy for breach because the damages are clearly liquidated. It is proper to include the $100,000.00 in Mortensen's balance sheet to determine solvency as a contract right existing as of February 1, 2005.

---

[35] Article 13 of the trust states that it is an irrevocable trust. *See* Def.'s Ex. A at Mortensen 0043.

[36] *Martin v. Mears*, 602 P.2d 421, 428-429 (Alaska 1979).

[37] *Restatement (Second) of Contracts* § 90 (1981).

Mortensen prepared a balance sheet on March 8, 2010, which reconstructs his financial status as of February 1, 2005.[38] This balance sheet shows that Mortensen had $153,020.00 in assets as of February 1, 2005. Some of those assets may have been exempt. He had a brokerage account designated as "ML SEP" for $3,606.00. This may be a form of pension plan that is exempt under AS 09.38.017. His other liquid assets may be exempt in the sum of $1,750.00 under A.S. 09.38.020 as it existed in 2005. The only other exemption for Mortensen would have been for an automobile in the amount of $3,750.00. After deductions for exemptions, Mortensen had assets totaling $143,914.00.

Mr. Mortensen's balance sheet lists liabilities totaling $49,711.00 as of February 1, 2005.[39] This sum may be low. At his § 341 creditors' meeting held on September 24, 2009, Mortensen testified that he owed roughly $85,000.00 on credit cards at the time the trust was created.[40] Using either figure, however, Mortensen was solvent at the time he created the trust. The trust was created in accordance with Alaska law.

Battley seeks judgment against Mortensen under 11 U.S.C. § 548(e), which contains a ten-year limitation period for setting aside a fraudulent transfer. Section 548(e) provides:

> (e)(1) In addition to any transfer that the trustee may otherwise avoid, the trustee may

---

[38] Pl.'s Ex. 21; Def.'s Ex. G.

[39] *Id.*

[40] Pl.'s Ex. 2 at 6.

13

avoid any transfer of an interest of the debtor in property that was made on or within 10 years before the date of the filing of the petition, if –

(A) such transfer was made to a self-settled trust or similar device;

(B) such transfer was by the debtor;

(C) the debtor is a beneficiary of such trust or similar device; and

(D) the debtor made such transfer with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made, indebted.[41]

Section 548(e) was added to the Bankruptcy Code in 2005, as part of the Bankruptcy Abuse Prevention and Consumer Protection Act.[42] Section 548(e) "closes the self-settled trusts loophole" and was directed at the five states that permitted such trusts, including Alaska.[43] Its main function "is to provide the estate representative with an extended reachback period for certain types of transfers."[44] However, the "actual intent"

---

[41] 11 U.S.C. § 548(e)(1).

[42] Pub. L. No. 109-8, § 1042 (2005).

[43] 5 COLLIER ON BANKRUPTCY ¶ 548.10[1], [3][a] n.6 (N. Alan Resnick & Henry J. Sommer eds., 16th ed.).

[44] *Id.*, ¶ 548.10[2].

14

requirement found in § 548(e)(1)(D) is identical to the standard found in § 548(a)(1)(A) for setting aside other fraudulent transfers and obligations.[45]

Mortensen's trust, established under AS 34.40.110, satisfies the first three subsections of § 548(e) – the Seldovia property was transferred to a self-settled trust, Mortensen made the transfer, and he is a beneficiary of the trust. The determinative issue here is whether Mortensen transferred the Seldovia property to the trust "with actual intent to hinder, delay, or defraud" his creditors.[46]

Mortensen says he did not have this intent when he created the trust and that he simply wanted to preserve the property for his children. Battley counters that Mortensen's intent is clear from the trust language itself. The trust's stated purpose was "to maximize the protection of the trust estate or estates from creditors' claims of the Grantor or any beneficiary and to minimize all wealth transfer taxes."[47] Mortensen argues that the trust language cannot be used to determine intent because Alaska law expressly prohibits it. Under Alaska law, "a settlor's expressed intention to protect trust assets from a beneficiary's potential future creditors is not evidence of an intent to defraud."[48] But is this state statutory provision determinative when applying § 548(e)(1)(D) of the Bankruptcy Code?

---

[45] 11 U.S.C. § 548(a)(1)(A), (e)(1)(D), *see also* 5 COLLIER ON BANKRUPTCY ¶ 548.10[3][d].

[46] 11 U.S.C. § 548(e)(1)(D).

[47] Def.'s Ex. A at Mortenson 0006.

[48] AS 34.40.110(b)(1).

15

Ordinarily, it is state law, rather than the Bankruptcy Code, which creates and defines a debtor's interest in property.[49]

> Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding.[50]

Here, Congress has codified a federal interest which requires a different result. Only five states allow their citizens to establish self-settled trusts.[51] Section 548(e) was enacted to close this "self-settled trust loophole."[52] As noted by Collier:

> [T]he addition of section 548(e) is a reaction to state legislation overturning the common law rule that self-settled spendthrift trusts may be reached by creditors (and thus also by the bankruptcy trustee.)[53]

It would be a very odd result for a court interpreting a federal statute aimed at closing a loophole to apply the state law that permits it. I conclude that a settlor's expressed intention to protect assets placed into a self-settled trust from a beneficiary's potential future creditors

---

[49] *Butner v. United States*, 440 U.S. 48, 55 (1979).

[50] *Id.*

[51] In addition to Alaska, Delaware, Nevada, Rhode Island and Utah permit the creation of self-settled trusts.

[52] 5 COLLIER ON BANKRUPTCY ¶ 548.10[1], *citing* H.R. Rep. No. 109-31, 109th Cong., 1st Sess. 449 (2005) (statement of Rep. Cannon).

[53] 5 COLLIER ON BANKRUPTCY ¶ 548.10[3][a] (footnotes omitted).

can be evidence of an intent to defraud. In this bankruptcy proceeding, AS 34.40.110(b)(1) cannot compel a different conclusion.

To establish an avoidable transfer under § 548(e), the trustee must show that the debtor made the transfer with the actual intent to hinder, delay and defraud present or future creditors by a preponderance of the evidence.[54] Here, the trust's express purpose was to hinder, delay and defraud present and future creditors. However, there is additional evidence which demonstrates that Mortensen's transfer of the Seldovia property to the trust was made with the intent to hinder, delay and defraud present and future creditors.

First, Mortensen was coming off some very lean years at the time he created the trust in 2005. His earnings over the preceding four years averaged just $11,644.00 annually.[55] He had burned through a $100,000.00 annuity which he had cashed out in 2000. He had also accumulated credit card debt of between $49,711.00 to $85,000.00 at the time the trust was created. He was experiencing "financial carnage" from his divorce. Comparing his low income to his estimated overhead of $5,000.00 per month (or $60,000.00 per year), Mortensen was well "under water" when he sought to put the Seldovia property out of reach of his creditors by placing it in the trust.

Further, when Mortensen received the $100,000.00 from his mother he didn't pay off his credit cards. Rather, he transferred $80,000.00 into the trust after paying a few

---

[54] *Consolidated Partners Inv. Co. v. Lake,* 152 B.R. 485, 488 (Bankr. N.D. Ohio 1993).

[55] See the discussion herein regarding Mortensen's income during this time, at pp. 4 - 5.

17

bills and began speculating in the stock market. He had a substantial credit card debt due to AT&T, approximately $15,200.00,[56] which was not paid in 2005. This debt had increased to $19,096.00 by the time he filed his bankruptcy petition.[57] In 2005, Mortensen also owed Capital 1 approximately $6,350.00 in credit card debt.[58] This debt had bumped up to $7,525.00 when he filed for bankruptcy.[59] He had a Discover card with a balance of $12,588.00 as of Feb. 1, 2005.[60] He owed Discover $11,905.00 when he filed bankruptcy.[61]

Mortensen claims he paid these accounts off on a number of occasions and then re-borrowed against them. I can find no evidence of such pay-offs in the documentary evidence and I don't believe Mortensen. Nor do I believe that the trust repaid Mortensen the $80,000 in 2006. If that had been the case, Mortensen wouldn't have needed to borrow another $29,000.00 on his credit cards.[62] I conclude that Mortensen's transfer of the Seldovia property and the placement of $80,000.00 into the trust constitutes persuasive evidence of an intent to hinder, delay and defraud present and future creditors.

---

[56] Pl.'s Ex. 23.

[57] Pl.'s Ex. 18 at 13. Citibank took over AT&T"s credit card business. It is listed as a creditor in the debtor's bankruptcy schedules for a loan with the same account number as the AT&T debt.

[58] Pl.'s Ex. 24 at 12.

[59] Pl.s Ex. 18 at 14.

[60] Pl.'s Ex. 25.

[61] Pl.'s Ex. 18 at 13.

[62] Pl.'s Ex. 44 shows an increase of about $29,000.00 in credit card debt from February 1, 2005 through December 31, 2006.

18

Mortensen alleged that the purpose of the trust was to preserve the Seldovia property for his children. Yet he used the trust as a vehicle for making stock market investments. In 2005, the trust had capital gains of nearly $7,000.00.[63] In 2006, the trust had capital gains of over $26,000.00.[64] In 2007, the trust had capital gains of $6,448.00.[65] In 2008 and 2009 the trust had either no capital gain income or experienced losses.[66] The trust also made a car loan to one of Mortensen's acquaintances. These activities had no relationship to the trust's alleged purpose.

The bottom line for Mr. Mortensen is that he attempted a clever but fundamentally flawed scheme to avoid exposure to his creditors. When he created the trust in 2005, he failed to recognize the danger posed by the Bankruptcy Abuse Protection and Consumer Protection Act, which was enacted later that year. Mortensen will now pay the price for his actions. His transfer of the Seldovia property to the Mortensen Seldovia Trust will be avoided.

The trustee has asked for costs and attorney's fees. His costs will be awarded. However, under the American Rule, attorney's fees are generally not recoverable for

---

[63] Def.'s Ex. S.

[64] Def.'s Ex. T.

[65] Def.'s Ex. U.

[66] Def.'s Exs. V and W.

19

litigating federal issues absent an agreement or specific statutory authority.[67] This avoidance action is brought under a provision of the Bankruptcy Code and raises federal issues. The trustee is not entitled an award of attorney's fees against the defendants.

Conclusion

The transfer of the Seldovia property from Thomas Mortensen to the Mortensen Seldovia trust will be avoided, pursuant to 11 U.S.C. § 548(e). The trustee will be awarded his costs but denied attorney's fees. An order and judgment will be entered consistent with this memorandum.

Dated: May 26, 2011

BY THE COURT

 /s/ Donald MacDonald IV
DONALD MacDONALD IV
United States Bankruptcy Judge

Serve: C. Christianson, Esq.
D. Bundy, Esq.

05/26/11

---

[67] *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240 (1975).